## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**SUZON TIFFINEY W.,**

    **Plaintiff,**

    **v.**

**COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,[1]**

    **Defendant.**

:
:
:
:
:
:
:
:
:
:
:

**CIVIL ACTION FILE NO.
1:17-cv-04038-AJB**

## O R D E R  A N D  O P I N I O N

Plaintiff brought this action pursuant to §§ 205(g) and 1631(c) of the Social

Security Act ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review

of the final decision of the Commissioner of the Social Security Administration ("the

Commissioner") denying her application for Supplemental Security Income ("SSI")

and Disability Insurance Benefits ("DIB").[2] The parties consented to magistrate judge

---

    [1]    Nancy A. Berryhill was the Acting Commissioner of Social Security beginning January 23, 2017. However, her acting status ended as a matter of law pursuant to the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq*. Pursuant to Fed. R. Civ. P. 17(d), a public officer who sues or is sued in an official capacity may be designated by official title rather than by name. Since Ms. Berryhill no longer is the Acting Commissioner, the Clerk is **DIRECTED** to identify Defendant by the official title rather than by name.

    [2]    Title XVI of the Act, 42 U.S.C. § 1381, *et seq.*, provides for SSI for the disabled, whereas Title II of the Social Security Act provides for federal DIB,

jurisdiction. (Dkt. Entry dated 01/29/18). For the reasons set forth below, the Commissioner's decision is **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART** for further consideration of Plaintiff's claims consistent with this Order and Opinion.

## I. PROCEDURAL HISTORY

On December 2, 2011, Plaintiff filed her application for SSI and DIB alleging a disability onset date of April 1, 2011. [Record (hereinafter "R") 484-85]. These claims were denied initially and upon reconsideration, [R485], but granted after a hearing before an Administrative Law Judge ("ALJ"). [R208-18]. However, on October 22, 2014, the Appeals Council ("AC") initiated an own-motion review, vacated

---

42 U.S.C. § 401, *et seq.* The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)). Title 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI. In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "Period of Disability," or to recover SSI. However, different statutes and regulations apply to each type of claim. Many times parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations herein should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

AO 72A
(Rev.8/8
2)

the ALJ's decision, and remanded the case because Plaintiff had engaged in substantial gainful employment after the alleged onset date. [R220-22].

On remand, the ALJ was instructed to obtain further evidence regarding Plaintiff's work activities and further develop the record regarding her residual functional capacity ("RFC"). [R222-23]. Supplemental hearings were held at which Plaintiff was represented by an attorney and she amended her alleged onset date to June 20, 2012. [R62, 75, 92, 96]. A vocational expert ("VE") also testified. [R62-133]. On May 19, 2017, the ALJ denied Plaintiff disability benefits. [R23]. Plaintiff then filed an appeal which the AC denied on August 17, 2017, making the ALJ's decision the final decision of the Commissioner. [R1-6].

Plaintiff then filed this action on October 12, 2017, seeking review of the Commissioner's decision. [Doc. 1-3]. The answer and transcript were filed on February 8, 2018. [Docs. 8-9]. On April 18, 2018, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 14], and on May 21, 2018, the Commissioner filed a response in support of the decision, [Doc. 16], to which Plaintiff replied, [Doc. 17]. The matter is now before the Court upon the administrative

3

record, and the parties' pleadings and briefs,[3] and it is accordingly ripe for review

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    *PLAINTIFF'S CONTENTIONS*

Plaintiff claims that the ALJ made the following errors:

1.    The ALJ failed to include work-related limitations in the RFC consistent with the opinions of Dr. Blaine and Dr. Khaleeli, which she accorded great weight, and the ALJ failed to provide any explanation for rejecting the opined limitations. Dr. Khaleeli's opinion of significant limitations was consistent with the opinion of Plaintiff's treating physician, Dr. Amin, which opinion the ALJ improperly discounted.

2.    The RFC is unsupported by substantial evidence, because the ALJ failed to develop the record regarding Plaintiff's need to elevate her legs, and relied on her own lay assumption regarding the proper height and angle of elevation necessary to relieve edema.

3.    The ALJ's step four and step five determinations are unsupported by substantial evidence because the ALJ relied upon an incomplete hypothetical question asked to the vocational expert.

[Doc. 14 at 1].

---

[3]    Neither party requested oral argument. (*See* Dkt.).

4

## III.  STATEMENT OF FACTS

### A.  Background

Plaintiff was born in 1971 and was 41 years old on the alleged onset date. [R484].  Plaintiff completed the eleventh grade and worked in the past as a caregiver. [R496].  She initially alleged disability due to due to depression, leg problems, fluid in legs, and high blood sugar, [R495], but, at the hearing, she alleged disability due to chronic lower extremity edema, neuropathy, hypertension, obesity, osteoarthritis in the knees, degenerative disc disease, fibromyalgia, major depressive disorder, varicose veins, post traumatic stress disorder ("PTSD"), and radial nerve injury of the upper left extremity.  [R98-99].

### B.  Lay Testimony

On March 1, 2016, Plaintiff testified at the supplemental hearing.  [R93].  She related that she experiences pain in both legs, lower back, knees, toes, and left arm and wrist.  [R111-12].  When asked to rate her pain (with 10 being amputation, six being she needs to go to the emergency room and can drive herself, and five being medication takes the edge off), Plaintiff stated that her right leg pain was around a five, her constant lower back pain around five, her left arm and leg were a 10, her constant right knee pain was a five, and her constant pain right leg pain was between a five and 10

5

depending on whether she had walked or taken medication. [R112-14]. She explained that she can lift up to 40 pounds when her left hand is at its strongest, but that it also sometimes weakens and falls or slips due to an injury that healed improperly. [R117-18]. She explained that she felt that she can only safely lift 15 pounds. [R127]. She endorsed no problems sitting except that when she sits too long her legs stiffen, so she moves five or six times during every hour of sitting or puts her right leg up high for the majority of the day. [R119, 134]. She walks about two miles if she can. [R119].

Plaintiff testified that she was unable to work "because of my physical limitations at this moment . . . I'm not going to say that I'm like handicapped and I just can't go in and like hold a job . . . I can make myself do that, but it's very uncomfortable leaving work early, I'm uncomfortable . . . I'm dealing with stuff mental . . . I just can't get it together . . . ." [R122]. She explained that she has difficulty concentrating, has depression, and did not like being around people. [R134].

Plaintiff testified that she was on the following medications: Triamtere for blood pressure and fluid; Gabapentin for her legs and cramps; Zoloft; and Ipramine without side effects. [R108-11]. She testified that she had not been in physical therapy since June 2012, had not received any injections in her back for pain, and was not using any assistive devices to ambulate or splints or braces. [R110-11]. She explained that

6

she was unable to have bariatric surgery as her doctors ordered, in part, due to caring for her daughter after a car accident, and, in part, due to her lack of insurance. [R121, 129]. She also explained that she tried to order a cane and back brace but her insurance would not cover them. [R130].

Plaintiff testified that she lives alone and subsists on Social Security. [R102]. Access to her apartment was by a total of eight stairs. [R104]. She testified that she owns a car and drives as needed—about four days a week—to grocery shop and go to medical appointments. [R103]. She also attended church and Bible study each once a week and sleeps eight hours through the night. [R115-16]. She testified that she can cook, wash, dress, shop, and clean normally and do crafts as a hobby. [R116-17]. She cared for her daughter after her daughter and infant granddaughter were in a car accident. [R120]. They stayed at her house and she cooked. [*Id.*]. She also occasionally helped her granddaughter to the bathroom and her daughter, who had broken legs and was in a wheelchair, dress and in and out of her wheelchair. [*Id.*]. Her other daughters helped with these tasks as well. [*Id.*].

She testified that she had applied to jobs in customer service and as a cashier since June 20, 2012, but did not apply for unemployment. [R102-03]. Plaintiff explained that, while self-employed in 2009 through 2012, she was a caregiver for

7

adults, assisting with errands, light housekeeping, paying bills, pet care, light lunches, and occasional turning or feeding them. [R105]. She testified that the heaviest amount she had to lift or carry was turning a 120-pound person. [*Id.*]. She also was a daycare worker setting food out for children, greeting them, and taking their coats. [R106]. These jobs were all part-time, no more than 20 hours a week, and she did not receive a salary, but her mother (who owned the establishments) handed her money sometimes or took it out of money that Plaintiff owed her. [*Id.*].

On December 16, 2016, Plaintiff testified at another hearing on the issue of her past relevant work since her previous disability determination. [R62]. Upon questioning by the ALJ, Plaintiff confirmed that she had worked as a caregiver in 2012 at her mother's boarding house and daycare changing sheets and helping with errands, bills, and some personal hygiene for older boarders. [R66-67].

### C.   Medical Records

#### 1.   *Physical Impairments*

On June 20, 2012, Plaintiff saw Dr. Carter at Cherokee Health for back and leg pain with some radiating pain in the thighs. [R712]. She felt significant swelling in the ankles, worse on the right, with varicose veins, somewhat helped by compression stockings; she reported that she was trying to keep her legs elevated and exercise more.

8

[*Id.*].  Physical examination revealed tenderness in the back and neck, osteoarthritic changes and crepitus[4] in the knees, and bilateral edema[5] in the ankles with varicose veins in both legs.  [R713-14].  Dr. Carter assessed depression, edema, and lumbago,[6] but noted that Plaintiff was unable to go for an MRI or nerve conduction testing due to lack of insurance.  [R714].  He prescribed Gabapentin[7] for pain, and advised Plaintiff to wear compression stockings and to "keep legs elevated during the day and at night" for edema with venous insufficiency.[8]  [*Id.*].

---

[4]      Crepitus refers to noise or vibration produced by rubbing bone or irregular cartilage surfaces together.  *PDR Med. Dictionary* 409 (1st ed. 1995).

[5]      Edema refers to swelling caused by fluid in the body's tissues.  It usually occurs in the feet, ankles, and legs, but it can involve the entire body.  MedlinePlus, Edema, https://medlineplus.gov/edema.html (last visited 3/26/19).

[6]      "Lumbago" describes pain in the mid and lower back; the term does not specify the cause of the pain.  *PDR Med. Dictionary* 998 (1st ed. 1995).

[7]      Gabapentin, also known by the brand name Neurontin, is often used to help control certain types of seizures in patients who have epilepsy.  Gabapentin is also used to relieve the pain of postherapeutic neuralgia (the burning, stabbing pain or aches that may last for months or years after an attack of shingles) and restless legs syndrome.  MedlinePlus, Gabapentin, https://medlineplus.gov/druginfo/meds/a694007.html (last visited 3/26/19).

[8]      Chronic venous stasis, also known as chronic venous insufficiency and chronic venous disease, is a condition in which the veins have problems sending blood from the legs back to the heart.  MedlinePlus, Venous Insufficiency, https://www.nlm.nih.gov/medlineplus/ency/article/000203.htm (last visited 3/26/19).

AO 72A
(Rev.8/8
2)

Plaintiff treated with Dr. Carter in November 2012, May 2013, August 2013, and April 2014 for persistent symptoms of fatigue, extremity weakness and numbness, back pain, neck pain, and edema in the ankles. [R700, 706-08, 726-29, 796]. In November 2012, Dr. Carter assessed hypertension, cervicalgia,[9] lumbago, polyneuropathy,[10] and depression, and prescribed an increased dose of Gabapentin, continued Sertraline,[11] and added Diclofenac[12] for pain. [R708-09]. In May 2013, Plaintiff complained of swelling and edema in the ankles, improved with raising legs, and Dr. Carter assessed chronic lumbago, hypertension, depression, obesity, polyneuropathy, malaise and fatigue, and prescribed medications. [R702-03]. In August 2013, physical examination revealed tenderness in the back, osteoarthritic changes in the knees, and bilateral ankle edema.

[9]    "Cervicalgia" refers generally to neck pain. *See* J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine, Illustrated* A-227, C-171 (46th ed. 2012).

[10]    "Axonal polyneuropathy" refers to disease or damage of nerve fibers where many nerves in different parts of the body are involved. *See* MedlinePlus, *Sensorimotor Polyneuropathy*, http://www.nlm.nih.gov/medlineplus/ency/article/000750.htm (last visited 3/26/19).

[11]    Zoloft (sertraline) is a selective serotonin uptake inhibitor ("SSRI") used to treat depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder, and social-anxiety disorder. MedlinePlus, *Sertraline*, https://medlineplus.gov/druginfo/meds/a697048.html (last visited 3/26/19).

[12]    Voltaren (diclofenac) is an anti-inflammatory used to relieve mild to moderate pain. MedlinePlus, *Diclofenac*, https://medlineplus.gov/druginfo/meds/a689002.html (last visited 3/26/19).

AO 72A (Rev.8/82)

[R728-29].  In April 2014, Plaintiff reported that Maxzide[13] daily only helped ankle swelling slightly, and edema was especially present when she was walking during the day.  [R796].  Physical examination revealed osteoarthritic changes in the bilateral knees, bilateral edema of the lower extremities, and bilateral varicose veins.  [R798].

Plaintiff established primary care with Dr. Alicia Shelly on July 15, 2014 for hypertension, back pain with radiculopathy,[14] wrist pain, and muscle spasm. [R739-40].  Dr. Shelly ordered x-rays of the spine, which revealed degenerative disc disease in the mid-back with disc space narrowing and osteophyte[15] formation. [R897].

---

[13]    Maxzide is a generic name prescription medication containing two diuretic drugs, triamterene and hydrochlorothiazide, that is  used to treat high blood pressure and edema. RxList, https://www.rxlist.com/maxide-side-effects-drug-center.htm (last visited 3/26/19).

[14]    Radiculopathy is an alternate name for a herniated (slipped) disk, which occurs when all or part of the softer center of a spinal disk is forced through a weakened part of the exterior of the disk, forming a protruding mass and placing pressure on nearby nerves.  Mayo Clinic, Herniated Disk, https://www.mayoclinic.org/diseases-conditions/herniated-disk/symptoms-causes/syc-20354095 (last visited 3/26/19); MedlinePlus, Herniated Disk, https://medlineplus.gov/ency/article/000442.htm (last visited 8/17/18); J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine, Illustrated* H-115 (46th ed. 2012).

[15]    Osteophytes are common features of osteoarthritis and can contribute both to the functional properties of affected joints and to clinical relevant symptoms. Osteophyte formation is highly associated with cartilage damage but osteophytes can develop without explicit cartilage damage.  Peter M. Van der Kraan Ph.D., and Wim B. Van den Berg, Ph.D., *Osteophytes: relevance and biology*, Osteoarthritis and

She referred Plaintiff for pain management, and in November 2014, Dr. Foster observed tenderness to palpation in the lumbar spine, pain with range of motion of the left wrist, and antalgic gait,[16] for which he prescribed Zanaflex,[17] Neurontin, hydrocodone-acetaminophen, and Mobic.[18] [R891-93]. Plaintiff maintained primary care with Dr. Shelly, with treatment encounters in January, April, and December 2015, and Dr. Shelly prescribed medications for hypertension, depression, and fibromyalgia.[19]

---

Cartilage, Vol. 15, Is. 3 (Mar.2007), available at https://www.sciencedirect.com/science/article/pii/S106345840600327X (last visited 3/26/19).

[16]     An antalgic gait is a limp adopted so as to avoid bearing weight on the injured side of the body, thereby reducing pain. The Free Online Medical Dictionary, Antalgic Gait, http://medical-dictionary.thefreedictionary.com/antalgic+gait (last visited 3/26/19).

[17]     Zanaflex is the brand name for tizanidine, a skeletal muscle relaxant that works by slowing action in the brain and nervous system to allow the muscles to relax. MedlinePlus, Tizanidine, https://medlineplus.gov/druginfo/meds/a601121.html (last visited 3/26/19).

[18]     Mobic (meloxicam) is in a class of medications called nonsteroidal anti-inflammatory drugs ("NSAIDs") and is often used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. MedlinePlus, Meloxicam, https://medlineplus.gov/druginfo/meds/a601242.html (last visited 3/26/19).

[19]     Fibromyalgia is a disorder that causes muscle pain and fatigue. Its cause is unknown. People with the disorder have tender points at specific places on the neck, shoulders, back, hips, arms, and legs that hurt when pressure is placed on them. MedlinePlus, Fibromyalgia, https://medlineplus.gov/fibromyalgia.html (last visited 3/26/19).

AO 72A
(Rev.8/8
2)

[R950-59]. Dr. Shelly opined that due to her conditions Plaintiff needed to elevate her legs whenever she is sitting down. [R1025]. In April 2016, Dr. Shelly wrote a statement indicating that she treats Plaintiff for fibromyalgia, peripheral neuropathy, major depression, hyperlipidemia,[20] and hypertension, and Plaintiff experiences bilateral burning sensations down her legs with cramping, as well as bilateral swelling. [R992]. These symptoms interfered with her walking and have caused falls. [Id.]. Dr. Shelly's treatment notes from April 1, 2016 and May 27, 2016 document complaints of numbness in both feet with tingling in the fingers, and Dr. Shelly prescribed Gabapentin for neuropathy. [R994, 996].

In May 2016, Plaintiff treated at Atlanta Heart Associates, P.C., and clinical findings included edema with chronic visible variscosities in the legs. [R1022]. She was referred for testing, which revealed significant venous reflux disease. [R1019]. Edema was again present in August 2016, and Dr. Menchion ordered a left lower extremity dialysis graft[21] assessment. [R1028-29].

---

[20]     Hyperlipidemia (lipid disorder) is the term for high blood cholesterol. *See* MedlinePlus, High blood cholesterol levels, http://www.nlm.nih.gov/medlineplus/ency/article/000403.htm (last visited 3/26/19).

[21]     A dialysis graft is used to filter waste and water from the bloodstream when the more common method of accessing the bloodstream (an arterio-venous fistula graft) cannot be made. The graft is a strong, artificial tube inserted by a surgeon under

13

AO 72A
(Rev.8/8
2)

2.    *Mental Impairments*

Throughout the relevant period Plaintiff also treated for various mental impairments, including depression, anxiety, PTSD, and borderline personality disorder. In June 2012, Plaintiff treated with Jeffrey Bull, Ph.D., who noted objective findings including fair reasoning, judgment, insight, and impulse control, irritable attitude, fidgety and agitated motor activity, rapid speech, depressed and labile mood, and expansive affect. [R715-16]. Plaintiff's primary care physician, Dr. Carter, treated these conditions with Trazodone[22] and Sertraline. [R712-14]. In May 2013, Dr. Carter refilled Trazodone and prescribed Venlafaxine.[23] [R702-03].

---

lower or upper extremity skin with one end connecting to a vein and the other connecting to arteries. https://www.niddk.nih.gov/health-information/kidney-disease/kidney-failure/hemodialysis (last visited 3/26/2019).

[22]    Trazodone is a serotonin modulator typically used to treat depression and works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. MedlinePlus, Trazodone, https://medlineplus.gov/druginfo/meds/a681038.html (last visited 3/26/19).

[23]    Effexor XR (venlafaxine) is an extended-release medication used to treat depression, "generalized anxiety disorder (GAD; excessive worrying that is difficult to control), social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life), and panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks)." MedlinePlus, Venlafaxine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html (last visited

14

AO 72A
(Rev.8/8
2)

In August 2013, Plaintiff reestablished care with Dr. Bull for behavioral health due to increasing symptoms, with depressed mood, trouble sleeping, fatigue, tearfulness, trouble concentrating, and isolating, with self-harm (cutting) to relieve emotional symptoms, as well as of intrusive thoughts of past abuse, irritability, and reactivity. [R730]. Mental status examination revealed poor insight and judgment, irritable attitude, depressed/labile mood, rapid and loud speech, and agitated motor activity. [*Id.*].

Plaintiff's condition persisted, and in October 2013, Dr. Bull recommended inpatient care with the Crisis Stabilization Unit ("CSU"), and Plaintiff was admitted for crisis care on October 21, 2013. [R718]. She was discharged on October 24, 2013 with a diagnosis of major depression PTSD, and a GAF of 40.[24] [*Id.*]. Upon discharge, she

_____

3/26/19).

[24] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR"). A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34.

AO 72A
(Rev.8/8
2)

received assistance from case managers utilizing community resources to obtain food and clothing. [R808-10].

In November 2013 and March 2014, Plaintiff treated with Dr. Perry at Cherokee Health for anxiety, depression, and self-harm, and Dr. Perry prescribed Imipramine[25] and Gabapentin. [R800-03].

Plaintiff treated with Eboni Winford, Ph.D., on September 3, 2014 for major depression, PTSD, and personality disorder, and she was referred for therapy. [R795]. On November 10, 2014, Plaintiff presented to Clayton Center to establish care for depression and self-harm and symptoms associated with past sexual trauma, as she was raped at age 14. [R869]. Reported symptoms included lack of appetite, weight gain, irritability, sleep disturbance, flashbacks, and daytime fatigue. [R864]. Her mood was depressed and she endorsed visual and auditory hallucinations, where she would see shadows, smell her abuser, and hear the sounds of the playground where she was abused. [R866]. Witni Jackson, LCSW, assessed major depressive disorder and PTSD. [R867].

---

[25]     Imipramine is a tricyclic antidepressant used to treat depression. https://medlineplus.gov/druginfo/meds/a682389.html#why (last visited 3/26/19).

AO 72A
(Rev.8/8
2)

Plaintiff maintained care at Clayton Center throughout 2015 and 2016 for ongoing symptoms, with an exacerbation of depressive symptoms in December 2015, when she complained of severe depression following the death of her sister. [R913-48, 969-90].

### 3. Medical Opinions

On April 30, 2012, Dr. Khaleeli completed a mental residual functional capacity assessment that detailed Plaintiff's ability to perform a variety of mental work activities. [R674-75]. Dr. Khaleeli opined that Plaintiff was markedly limited in ability to interact with the general public, and moderately limited in ability to work with and in proximity to coworkers and to accept instructions and criticism from supervisors. [R675]. Dr. Khaleeli explained in a narrative statement that Plaintiff "cannot interact appropriately with the public, but can interact appropriately with coworkers and supervisors occasionally during a workday" in an appropriate work environment. [R675-76].

Plaintiff presented for a consultative examination with Dr. Blaine on May 8, 2012, and complained of consistent leg swelling, not relieved by medications. [R679]. She reported that this condition this causes difficulty walking, and compression stockings did not help. [*Id.*]. Examination revealed decreased range of motion in the

17

spine, shoulders, hips, and knees, with pitting edema in both legs from the knees down. [R680-81]. She had a wide stance due to obesity, and her gait was antalgic, favoring the right leg. [R681]. She was unable to tandem walk, but could stand independently on either foot for several seconds. [*Id.*]. Dr. Blaine diagnosed right leg pain due to edema, and opined Plaintiff could stand or walk for two hours total in an eight-hour workday. [*Id.*]. He opined that Plaintiff could lift and carry up to about 20 pounds "infrequently," and she could sit for eight-hours with reasonable rest breaks. [*Id.*].

### D.    Vocational-Expert Testimony

The VE testified that a person of plaintiff's age, education, and work experience could perform Plaintiff's past work as a home caregiver in the light duty category, with a reduced number of jobs available, with an RFC as follows: able to lift and carry up to 20 pounds occasionally, 10 pounds frequently; able to stand and/or walk five hours per eight-hour day, and sit six hours per eight-hour day with normal breaks; able to climb ramps and stairs, occasionally, but never climb ladders, ropes and scaffolds; able to balance frequently, stoop and crouch occasionally, but never kneel or crawl; able to perform occasional operational foot controls bilaterally; and must avoid concentrated exposure to extreme heat, extreme cold, and hazards such as dangerous moving machinery, and unprotected heights. [R82-84]. Alternatively, the VE testified that the

18

same hypothetical person with the additional limitations of being able to understand, remember, and carry out simple, and detailed instructions; able to make simple, work related decisions, adapt to occasional changes in the work process and environment; able to maintain concentration for two hours at a time in an eight-hour workday; and able to engage in no more than frequent interaction with the public, coworkers, and supervisors, could perform the home healthcare giver, stock clerk, order filler, or industrial hand packer. [R84-85]. However, the VE testified that if Plaintiff needed to elevate her legs to waist level when seated, competitive employment would be precluded. [R85].

## IV.     ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact:

1.      Claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.      Claimant has not engaged in substantial gainful activity since June 20, 2012, the amended alleged onset date (20 CFR 416.971 *et seq.* and 404.1571 *et seq.*).

. . .

3.      Claimant has the following severe impairments: obesity, degenerative disc disease, osteoarthritis of the bilateral knees, neuropathy, venous insufficiency, posttraumatic stress

AO 72A
(Rev.8/8
2)

disorder (PTSD), major depressive disorder and anxiety (20 CFR 404.1520(c) and 416.920(c))

. . .

4.     Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1520, 404.1526, 416.920(d), 416.925, and 416.926).

. . .

5.     After careful consideration of the entire record, the undersigned finds that Claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently; and able to stand and/or walk for 5 hours per 8 hour day and sit for 6 hours per 8 hour day with normal breaks.  Claimant is able to climb ramps and stairs occasionally, but never climb ladders, ropes, and scaffolds; and can balance frequently, stoop, and crouch occasionally, but never kneel or crawl.  Claimant is able to perform occasional operation of foot controls bilaterally, and when in a seated position would need to elevate her feet 6 inches under the workstation.  Claimant  must avoid concentrated exposure to extreme heat, extreme cold, and hazards such as dangerous moving machinery and unprotected heights. Claimant is able to understand, remember and carry out simple and detailed instructions; able to make simple work-related decisions; and able to adapt to occasional changes in the work process and environment.  Claimant is able to maintain concentration for two hours at a time in an 8-hour workday and is able to engage in no more than

frequent interaction with the general public, coworkers and supervisors. Claimant will be off-task at unpredictable times 4% of the work period due to medical conditions, pain and effects of medications and absent one day every 45 days.

. . .

6.   The claimant is capable of performing past relevant work as a home caregiver, as generally performed at the light exertional level. This work does not require the performance of work-related activities precluded by Claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

. . .

7.   The claimant has not been under a disability, as defined in the Social Security Act, from June 20, 2012, the amended alleged onset date through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

[R26-53].

In her evaluation of Plaintiff's claims, the ALJ found that, although Plaintiff had a history of varicose veins, restless leg syndrome, hyperlipidemia, hypertension and allergic rhinitis, the objective record lacked evidence of clinical or diagnostic abnormalities or functional limitations related to the same. [R27]. She also found that Plaintiff's history of a left wrist fracture was not severe because she: had gross sensation in her fingers, [R27 (citing [R560, R612])]; arrived late for her 2010 appointment to recast her wrist after it healed improperly [*id.* (citing [R605])]; never

21

returned to the facility for re-casting in 2011 after multiple calls from the facility, [R28 (citing [R604])]; had not worn her wrist splint for the three months preceding the hearing [*id.*]; reported in November 2011 that it was healing and did not return for treatment for over two years or voice any concerns about it, [*id.* (citing [R598, 637-59, 700-32, 794-860, 886-98, 950-59, 994-1016])]; could move her wrist well and extend it to near the normal range of motion and flex all five digits, [*id.* (citing [R603-04])]; had 5/5 strength bilaterally in November 2014, [R29 (citing [R892])]; and her description of her daily activities was inconsistent with her purported complaints, [*id.*].

The ALJ also noted that Plaintiff was diagnosed with fibromyalgia but that it was not severe because she did not satisfy SSR 12-2p by meeting the 1990 American College of Rheumatology ("ACR") Criteria for the same or the 2010 ACR Preliminary Diagnostic Criteria. [R29-30]. Although Plaintiff did exhibit the requisite 11 of 18 tender point findings in December 2015, she did not seek treatment with a specialist or voice complaints in a follow-up visit, and there were no tender points noted on later examinations. [R31 (citing [R892, 950, 999, 1018-23, 1028-42])]. The ALJ also found that Plaintiff's fibromyalgia was not severe because she lacked pain on both sides of her body above and below waist for at least three months or experience repeated manifestations of six or more symptoms such as fatigue, dizziness, constipation, chest

22

pain, fever, diarrhea, dry mouth, vomiting, oral ulcers, hair loss, seizures, loss of appetite, or loss of change in pace. [R29-30 (citing [R655])]. Rather, the ALJ noted that Plaintiff's chief complaints for back, neck, and leg pain could be associated with her other diagnoses such as lumbago, edema, degenerative disc disease, venous insufficiency, varicose veins, and morbid obesity. [R30 (citing [R595-615, 647-08, 679-81, 706, 734-49, 794-860, 895-98, 906-10, 950-59, 1019-20, 1025-26, 1056-63, 1084])]. The ALJ further noted that she considered Plaintiff's cannabis abuse and found that, although she smoked during treatment, it did not establish a chronic abuse problem or that her other symptoms are exacerbated by it. [R32 (citing [R643, 838, 862-84, 887, 901])].

The ALJ found that Plaintiff did not meet Listings: 1.02 (Major dysfunction of a joint(s) (due to any cause)), 1.04 (Disorders of the spine), 4.11 (Chronic venous insufficiency); or 11.14 (Peripheral neuropathy). [R32]. The ALJ noted that she considered Plaintiff's impairments in combination with her obesity, acknowledging that obesity may exacerbate musculoskeletal impairments and functional limitations. [*Id.*]. However, the ALJ found that the objective clinical findings and diagnostic tests did not support a finding of severity, singly or in combination, that equaled Listings 1.00

23

AO 72A
(Rev.8/8
2)

(Musculoskeletal system), 3.00 (Respiratory system), 4.00 (Cardiovascular system), or 11.00 (Neurological system). [R33].

The ALJ also found that Plaintiff's mental impairments, single or in combination, did not meet or medically equal the criteria of listings 12.04 (Depressive, bipolar and related disorders), 12.06 (Anxiety and obsessive-compulsive disorders), 12.08 (Personality and impulse control disorders), and 12. 15 (Trauma and stressor-related disorders). [R33]. More specifically, the ALJ found that, despite her testimony about cloudy memory, Plaintiff had mild limitations in understanding, remembering, and applying information, because she independently cares for herself (including transportation, handling money, and personal hygiene). [*Id.*].

The ALJ further found that Plaintiff had moderate limitations interacting with others, noting that, although she reported being socially withdrawn, mood swings, and difficulty getting along with others, she travels with family by car for three and a half hours, spends time with her children and grandchildren, and attends church and Bible study weekly. [R34]. The ALJ also found that Plaintiff had moderate limitations with concentration, persistence, and maintaining pace. [*Id.*]. Although Plaintiff endorsed intrusive thoughts and difficulty completing tasks and following instructions, she had no issues with caring for herself, managing her finances, or in performing hobbies.

24

[*Id.*].  The ALJ also concluded that Plaintiff had no limitations adapting or managing herself as she endorsed no issues on her 2012 function report and testified to independently caring for herself.  [R35].

The ALJ also concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms but that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the record or credible because the treatment she has required throughout the relevant period was relatively routine and conservative in nature, observing that she did not require frequent emergency room visits or inpatient treatment for pain, the record did not document any physical therapy treatment or ongoing treatment in a pain clinic, nor did it reveal that Plaintiff needed any medically required hand-held assistive devices for walking or standing, or a brace or TENS unit for pain. She also noted that Plaintiff had been prescribed and took appropriate medications for her alleged impairments and symptoms, which the record revealed were relatively effective in controlling the purported symptoms when she was medication compliant. The ALJ also stated that the voluminous medical record failed to document ongoing clinical abnormalities or functional limitations of such severity, persistence and intensity that would preclude the performance of the light range of work outlined in the

25

AO 72A
(Rev.8/8
2)

RFC, which would allow elevation of the legs six inches under the workstation. [R40]. The ALJ also noted Plaintiff's daily activities were not limited to the extent one would expect given complaints of disabling pain and Plaintiff acknowledged applying for part-time jobs, worked part time, and cared for her daughter and granddaughter, even going so far as to declare them as dependents on her tax returns. [R45].

The ALJ made the same finding with regards to Plaintiff's mental impairments, observing that the record lacked evidence of emergency room treatment or inpatient hospitalizations for any mental health problem within the relevant period; the documented outpatient treatment she received was conservative and essentially routine in nature; there were significant gaps in her mental health treatment history; and she was not been entirely compliant in taking prescribed medication, but when compliant her symptoms were reasonably controlled. [R46].

The ALJ accorded "some weight to the opinion of Dr. Carter that she keep the legs elevated as it is consistent with [Plaintiff's] subjective complaints and clinical signs and findings of lower extremity edema and venous insufficiency. Hence, a reasonable accommodation to elevate the feet 6 inches under the workstation when in a seated position was provided in the residual functional capacity." [R44-45]. In discussing Plaintiff's treating physician, Dr. Shelly, the ALJ observed that in

26

Dr. Shelly's July 16, 2016 form, where Dr. Shelly stated that she diagnosed Plaintiff

with varicose veins, major depressive disorder, neuropathy, edema, and hypertension,

Dr. Shelly

> recommended [that Plaintiff] elevate her legs whenever she is sitting
> down. However, Dr. Shelly reported [Plaintiff] has no restrictions to her
> daily activities, i.e. limited lifting, standing, walking. Great weight is
> given to this opinion as the medical record identifies the diagnoses stated
> and her opinion is consistent with the outpatient treatment records and the
> findings of Dr. Blaine. Additionally, her opinion on the need to elevate
> the legs is consistent with the objective clinical and diagnostic evidence
> and the recommendation of Dr. Carter, and the residual functional
> capacity reasonably accommodates such restriction.

[R45-46 (citing [R1025])]. However, the ALJ gave little weight to Dr. Shelly's

April 26, 2016 letter, [R992]—where Dr. Shelly stated that Plaintiff "suffered for many

years with" fibromyalgia, peripheral neuropathy, major depression, hyperlipidemia, and

hypertension; experiences bilateral burning sensation that radiates down her legs, and

cramping, and these symptoms make it difficult for her to walk at times and she has

fallen due to her right leg giving out on her; and she also has experienced swelling

bilaterally—because she "appears to be providing a statement of [Plaintiff's] subjective

report of symptoms and limitations. She did not identify any supporting clinical or

diagnostic evidence nor any specific and related functional limitations." [R46].

AO 72A
(Rev.8/8
2)

The ALJ accorded "great weight" to Dr. Blaine's opinion because Dr. Blaine performed a thorough exam, his conclusions were consistent with his findings, and his opinion is consistent with the record. [R45]. The ALJ concluded that Dr. Blaine's opinion "is consistent with the residual functional capacity established herein." [R41]. However, the ALJ rejected the portions of Dr. Blaine's opinion favoring more significant limitations without explanation.

The ALJ accorded "some weight" to Dr. Khaleeli's opinion, finding it "consistent with the medical record as of the time of [her] decision. However, the additional limitations provided for in the [RFC] are warranted based on the more recent medical evidence and testimony provided at the hearings." [R51]. The ALJ also gave little weight to the January 25, 2016 physical assessment form completed by Dr. Rashid N. Amin, M.D., [R961-67], which indicated Plaintiff had major depression and her symptoms were severe enough to "often" interfere with the attention and concentration required to perform simple work-related tasks and would cause her to be absent from work as result of impairments or treatment more than four times a month. [R50]. The ALJ noted that "[t]hat same day, Dr. Amin completed a mental capacity assessment on behalf of Claimant indicating Claimant has slight, moderate, marked and extreme limitations in her mental functioning." [*Id.*]. The ALJ concluded that

28

the limitations provided by Dr. Amin are extreme and inconsistent with the longitudinal record, Claimant's conservative treatment history, her use of medications, the documented clinical findings and Claimant's daily activities. "Often" is not a vocational term and Dr. Amin does not quantify or qualify the meaning of "often." Additionally, Dr. Amin's opinions are quite conclusory, providing no explanation of the evidence relied on in forming that opinion and his own treatment notes do not reveal the type of significant clinical and diagnostic abnormalities one would expect if Claimant did in fact have the extreme limitations identified.

[*Id.*]. The ALJ also have little weight to the GAF scores of record, [R794-810], on the grounds that the Commissioner has declined to endorse the GAF scale. [*Id.*]

At step five, the ALJ found that, based on the VE's testimony, Plaintiff can perform past work as a caregiver as it is generally performed at the light level, of which there were 360,000 positions nationally. [R51]. The ALJ also found, based on the VE's testimony, that Plaintiff can perform other work in the national economy, such as a stock clerk and order filler, or industrial hand packer, of which there are 103,400 and 192,000 jobs nationally. [R51-52].

## V.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

29

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or

30

combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.

AO 72A
(Rev.8/8
2)

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## VI. SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v.*

AO 72A
(Rev.8/8
2)

*Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

33

## VII. CLAIMS OF ERROR

### A. The ALJ failed to include work-related limitations in the RFC consistent with the opinions of Dr. Blaine and failed to provide any explanation for rejecting the same.

Plaintiff claims that, although the ALJ gave great weight to Dr. Blaine, she improperly excluded that part of Dr. Blaine's opinion opining that she cannot stand or walk for more than two hours in an eight-hour workday. [Doc. 14 at 13]. Specifically, Plaintiff claims that "the ALJ's assertion that Plaintiff can perform 'light work,' and stand and walk for a total of five hours in an eight-hour workday is directly contradicted by Dr. Blaine's opinion that Plaintiff can stand and walk for only two hours total in the workday," which is defined as sedentary work. [*Id.* at 14 (citing [R35, 45])].

The Commissioner acknowledges that there is a discrepancy between the ALJ's decision to give great weight to Dr. Blaine's opinion and her RFC finding. [Doc. 16 at 12-13 (citing [R35-56, 41, 45, 681])]. However, the Commissioner argues that this error is harmless because, first, Plaintiff could still perform past relevant work if she were limited to sedentary walking and standing. [*Id.* at 13 (citing *Edwards v. Sullivan*, 937 F.2d 580, 586 (11th Cir. 1991); *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009); SSR 82-61, 1982 WL 31387, *2 (S.S.A.) ("[A] claimant will be found 'not

34

disabled' when it is determined that . . . she retains the RFC to perform . . . [t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy.")] Second, the Commissioner argues that, even if Plaintiff could not perform past relevant work, she would still not be disabled because she could perform other jobs existing in significant numbers in the national economy. [*Id.* at 14].

Plaintiff replies that the Commissioner misconstrues the VE's testimony which, in response to a hypothetical question that did not encompass the leg elevation limitation, stated that 20 percent of home caregiver jobs could be performed at the sedentary level. [Doc. 17 at 2 (citing [R86-89])]. Rather, the VE testified that light duty jobs would involve minimal sitting, and therefore minimal raising of the legs and there is no testimony that combines Dr. Blaine's opined limitation that Plaintiff sit for six hours, with the limitation that, whenever sitting, Plaintiff's feet must elevated. [*Id.* at 2-3].

Looking more closely at the VE's testimony reveals that Plaintiff's past relevant work as a housekeeper is eliminated with the six-inch elevation hypothetical. [R86]. However, past relevant work in homecare remains, but the number of available jobs erodes to 50 percent (or 360,000 job nationally), whereas the other positions of stock

clerk and hand packer remain, but are also eroded by 80 percent (or 102,400 nationally) and 40 percent (192,000 nationally) respectively. [R87-88]. These are precisely the numbers the ALJ relied on in concluding that, even if Plaintiff could not perform past relevant work, sufficient jobs exist in the national economy that Plaintiff could perform. [R52-53]. As a result, assuming that the ALJ erred in analyzing Dr. Blaine's finding in formulating the RFC, that error was harmless, as the ALJ identified other jobs Plaintiff could perform.

Accordingly, Plaintiff has not shown reversible error in this specification.

**B.      The ALJ failed to include work-related limitation in the RFC consistent with the opinions of Dr. Khaleeli and failed to provide any explanation for rejecting the same.**

Plaintiff argues that the ALJ erred by according "some weight" to Dr. Khaleeli's opinion, finding it consistent with medical record, and then stating that the RFC was more restrictive, when the RFC was actually less restrictive than Dr. Khaleeli's opinion. [Doc. 14 at 13]. Specifically, Plaintiff argues that, contrary to Dr. Khaleeli's opinion that Plaintiff could not interact appropriately with the public and could only occasionally interact with coworkers and supervisors, the ALJ concluded, without explanation, that Plaintiff can frequently interact with the public, co-workers, and supervisors. [*Id.* at 16-17 (citing [R35-36, 675-76])].

36

The Commissioner responds that it is clear from the ALJ's decision that she expressly found that Plaintiff had only moderate social limitations and could handle frequent interactions with others based on the record as a whole, including Plaintiff's daily social activities, treatment records revealing effective conservative treatment with medication, gaps in compliance and treatment, no ongoing clinical or functional abnormalities, and no debilitating social limitations absent medication. [Doc. 16 at 16-17 (citing [R34-36, 46-51, 102-04, 116, 123, 595, 600, 638-40, 643, 655, 657, 710, 712, 715-16, 718, 726, 730, 784, 800, 802-04, 815, 817, 823, 833, 875, 903, 915-16, 927-28, 935, 937-38, 980-82])]. Plaintiff replies that the record as a whole is not sufficiently clear, concise, and unambiguous to allow for meaningful review. [Doc. 17 at 3-4 (citing *Sommerfeldt v. Comm'r of Soc. Sec.*, No. CV213-146, 2014 WL 4187503, at *3 (S.D. Ga. Aug. 22, 2014) (citing Social Security Ruling 96-8p); *Maffia v. Comm'r of Soc. Sec.*, 291 Fed. Appx. 261, 265 (11th Cir. Aug. 28, 2008))].

In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with

37

information in the claimant's case record.  20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).  However, the regulations do not require the ALJ to explicitly identify these factors.  *See* 20 C.F.R. § 404.1527(d) (stating only that the Commissioner "consider[s] all of the following factors in deciding the weight [he] gives to any medical opinion"); *see also Amilpas v. Astrue*, No. 09-cv-0389, 2010 WL 2303302, *6 (W.D. Tex. May 17, 2010) ("I cannot conclude that the ALJ made a legal error [] because the regulations do not require the ALJ to explicitly address each 404.1527(d) factor.") (R&R *adopted by* 2010 WL 2756552 (W.D. Tex. July 12, 2010 at *5 & n.38). Nor does the Social Security Ruling that interprets § 404.1527(d) state that the ALJ is required to explicitly identify these six factors in his opinion, only that the treating source medical opinions "must be weighed using all of the factors provided" by § 404.1527.  SSR 96-2p.[26]  Lastly, courts have concluded that an ALJ does not err by failing to expressly address each of the factors outlined in 20 C.F.R. § 404.1527(d).  *See Armijo v. Astrue*, 385 Fed. Appx. 789, 795 (10th Cir. June 16, 2010) (citing *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. Dec. 7, 2007)).

---

[26]     Although 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) have been superceded and SSR 96-2p has been rescinded, they remain applicable to cases filed prior to March 27, 2017. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2017); Corrected Not. of Rescission, SSR 96-2p, 2017 WL 3928297 (Apr. 6, 2017).

AO 72A
(Rev.8/8
2)

Moreover, "the report of a non-examining doctor is accorded little weight if it contradicts an examining doctor's report; such a report, standing alone, cannot constitute substantial evidence." *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991); *see also Kemp v. Astrue*, 308 Fed. Appx. 423, 427 (11th Cir. Jan. 26, 2009) (per curiam). However, "the opinion of a non-examining physician who has reviewed medical records may be substantial evidence if it is consistent with the well-supported opinions of examining physicians or other medical evidence in the record." *Hogan v. Astrue*, Civil Action No. 2:11cv237-CSC, 2012 WL 3155570, at *5 (M.D. Ala. Aug. 3, 2012) (harmonizing Eleventh Circuit cases).

Here, the ALJ noted that she accorded "some weight" to "State agency consultants findings at the lower level of administrative review" "as they are consistent with the medical record as of the time of their decision." [R51]. Therefore, the ALJ acknowledged that Dr. Khaleeli was neither a treating nor an examining physician, both factors to be considered under 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). The ALJ also explained that she accorded Dr. Khaleeli's opinion *more weight than what is normally due* because it was consistent with the medical records at that time. [R51]. While it is true that the ALJ did not explain these medical records in the same

39

paragraph, it is evident from the ALJ's discussion of whether Plaintiff's mental disorders met or medically equaled a Listing at step three that the ALJ found Plaintiff's ability to interact with others only moderately impaired due to her reports of daily activities, which included long car trips with family members, church, Bible study, errands, and time with her children. [R34]. It is also clear that the ALJ considered and summarized numerous mental health records from November 2011 through February 2016 in reaching the determination that Plaintiff's mental illness was not as disabling as alleged (due to her non-compliance, gaps in treatment, conservative treatment, effectiveness of treatment, activities of daily living, and paucity of ongoing clinical or functional abnormalities). [R46-50].

As a result, the Court finds that the ALJ applied the proper legal standards. *Washington*, 558 F. Supp. 2d at 1296; *Fields*, 498 F. Supp. 488. While Plaintiff may take issue with the eventual weight that the ALJ accorded to these opinions, it is not the Court's role to decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer*, 395 F.3d at 1210. Moreover, the ALJ explained her findings with respect to Plaintiff's overall mental health issues–and, more specifically, her ability to interact with others–comprehensively and clearly, such that the Court could meaningfully review the decision. While the Court agrees that the RFC

40

the ALJ gave was actually less restrictive than the one provided by Dr. Khaleeli, in that it did not account for marked limitations in social interactions, this was a harmless error because, at step three, the ALJ did not find that Plaintiff had marked limitations in this area.

Accordingly, Plaintiff has not shown reversible error on this specification.

## C.  The ALJ erred in the weight assigned to the opinion of Plaintiff's treating physician, Dr. Amin.

Plaintiff argues that the ALJ improperly discounted Dr. Amin's opinion without offering good reasons for doing so. [Doc. 14 at 18-19].[27] Specifically, Plaintiff argues that "Dr. Amin's opinion of limited ability to concentrate and interact with others is consistent with the evidence of record documenting persistent mental health symptoms . . . [that] would interfere with Plaintiff's ability to meet the mental demands of competitive employment." [*Id.* at 21]. Plaintiff points to the following to show this consistency:

> Plaintiff suffers a persistent history of mental health problems with treatment through specialists and primary care physicians. Throughout 2012, Plaintiff complained of depressive symptoms and suicidal thoughts, and Dr. Bull's findings in therapy reflected fair reasoning, judgment, insight, and impulse control, irritable attitude, fidgety and agitated motor activity, rapid speech, depressed and labile mood, and expansive affect.

―――――――――――――――――

[27]     Plaintiff reiterates this point in her reply. [Doc. 17 at 5].

41

[R]707-08, 712, 715-16. When Plaintiff reestablished treatment with Dr. Bull in 2013, she complained of increasing symptoms, with depressed mood, trouble sleeping, fatigue, tearfulness, trouble concentrating, and isolating, with self-harm (cutting) to relieve emotional symptoms. [R]724, 730. Dr. Bull's clinical findings included poor insight and judgment, irritable attitude, depressed/labile mood, rapid and loud speech, and agitated motor activity. [R]724, 730. In October 2013, Plaintiff received inpatient treatment with the CSU for major depression and PTSD, with associated symptoms of self-isolation, paranoia, difficulty being around others, low energy, hopelessness, anxiety, and racing and intrusive thoughts. [R]718, 722. Plaintiff established therapy with Dr. Winford in September 2014 with diagnoses of major depression, PTSD, and borderline personality disorder, with goals of increasing her ability to manage mood and developing coping skills. [R]795. In November 2014, Plaintiff established care at the Clayton Center for depression and self-harm, and it was noted her mood was depressed and she endorsed visual and auditory hallucinations. [R]866. She maintained care at the Clayton Center with Dr. Amin and a counselor through at least March 2016 for ongoing depressed mood and anxiety with difficulty managing symptoms and stress, as well as difficulty socializing with others. [R]977-90.

[*Id.* at 20-21].

The Commissioner responds that the ALJ gave many good reasons for discounting Dr. Amin's opinion including "the longitudinal record, Plaintiff's conservative treatment history, her use of medications, the documented clinical findings, and her daily activities" as well as gaps in treatment, noncompliance, effective treatment when compliant, and daily activities. [Doc. 16 at 19 (citing [R46-50, 101-04, 116-18, 123, 133, 510])]. Moreover, the Commissioner points out that the ALJ noted

AO 72A
(Rev.8/8
2)

that Dr. Amin's use of the term "often" was ambiguous and there was no explanation of the evidence upon which his opinion relied. [*Id.* at 20 (citing [R50, 965-66])].

The decision not to give a treating-source medical opinion controlling weight does not mean that the opinion should be rejected, SSR 96-2p, but neither does it mean that it *cannot* be rejected. Eleventh Circuit precedent contemplates such a rejection. *See Pritchett v. Comm'r, Soc. Sec. Admin.*, 315 Fed. Appx. 806, 810 (11th Cir. Feb. 24, 2009) (finding the ALJ did not err in assigning no weight to the treating physician's conclusion that Plaintiff probably was medically disabled, because the ALJ clearly articulated its decision and because the doctor's opinion was inconsistent with his own records); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) ("The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."); *see also Davis v. Astrue*, 287 Fed. Appx. 748, 753 (11th Cir. July 9, 2008) (where court, instead of stating that assigning no weight to a treating physician's opinion is impermissible, identified reasons why the ALJ's decision to do so was unsupported by the record).

The Court finds no error in the ALJ's weighing of Dr. Amin's opinion. Although the ALJ did not identify or address each of the § 404.1527(d) factors, as the Court explained in Part VII.B *supra*, that is not reversible error. First, the ALJ extensively

AO 72A
(Rev.8/8
2)

considered and summarized many of the very same mental health records Plaintiff cites as evidence of her mental health impairments, which are treatment notes spanning from 2012 to 2014. [R47-49]. In so doing, the ALJ noted that, in addition to mental health diagnoses, Plaintiff did not always take medication as prescribed, there were signifcant gaps in her treatment, she sometimes refused mental health treatment altogether, but when she took medication and received consistent treatment, her symptoms were alleviated and she had few functional limitations. [*Id.* (citing [R661-63, 701, 711, 717-20, 726, 730, 804, 822, 827, 832, 901, 913, 925])]. Second, the ALJ concluded that Plaintiff's conservative treatment, significant gaps in treatment, medication non-compliance, and few documented clinical abnormalities were inconsistent with the level of impairment that she alleged. [R49]. Third, after the ALJ's extensive analysis and discussion of Plaintiff's mental health record, the ALJ found that Dr. Amin's opinions were inconsistent with the record, her conservative treatment, use of medication, documented clinical findings, and daily activities. [R50].

Therefore, the ALJ implicitly applied at least four of the § 404.1527(d) factors: the treating relationship; the medical evidence supporting the opinion; the consistency with the record a whole; and other factors which tend to support or contradict the opinion. [*Id.*]. While the Plaintiff may disagree with the ALJ's conclusions, nothing

44

in the ALJ's decisions indicates that the ALJ failed to consider the record or applied incorrect legal standards in reaching her determination. As it is not the task of this Court to decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner, it finds no error in the ALJ's weighing of Dr. Amin's opinion. *See Dyer*, 395 F.3d at 1210; *Lewis*, 125 F.3d at 1439-40; *Barnes*, 932 F.2d at 1358; *Martin*, 894 F.2d at 1529; *Walker*, 826 F.2d at 999; *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.

As a result, Plaintiff has not established that the ALJ reversibly erred in this specification.

**D.      The ALJ failed to develop the record regarding Plaintiff's need to elevate her legs and relied on her own lay assumption regarding the proper height and angle of elevation necessary to relieve edema.**

Plaintiff claims that the ALJ acknowledged Plaintiff's need to elevate her legs but "arbitrarily concluded an accommodation permitting Plaintiff to 'elevate the feet 6 inches under the work station when in a seated position' was sufficient." [Doc. 14 at 22-23 (citing [R45])]. Plaintiff claims that, in doing so, the ALJ substituted her own lay assessment without citing any basis for the conclusion. [*Id.* (citing *Jackson v. Colvin*, No. 1:14-CV-01868-AJB, 2015 WL 5601876, at *16 (N.D. Ga. Sept. 23, 2015); *Flentroy-Tennant v. Astrue*, No. 3:07-CV-101-J-TEM, 2008 WL 876961, at *8

45

(M.D. Fla. Mar. 27, 2008) ("An ALJ is required to build an accurate and logical bridge from the evidence to his or her conclusion" (citing *Baker v. Barnhart*, No. 03 C 2291, 2004 WL 2032316, at *6 (N.D. Ill. Sept. 9, 2004)))].

The Commissioner responds that it is Plaintiff who must prove her disability and present the evidence supporting it, and her doctors were not specific about what raising her legs entailed. [Doc. 16 at 20-21 (citing 20 C.F.R. §§ 404.1512(a), 404.1546(c), 416.912(a), *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *Castle v. Colvin*, 557 Fed. Appx. 849, 853 (11th Cir. 2014); [R714, 1025])]. Moreover, the Commissioner argues that, even if the ALJ erred, remand is not warranted because Plaintiff did not demonstrate an inability to perform her past work if she needed to elevate her feet more than the RFC. [*Id.* at 21]. Plaintiff replies that this does not excuse the fact that the RFC lacks evidentiary support in this regard and the ALJ has guessed at the functional limitations posed by the clinical findings. [Doc. 17 at 6 (citing *Jackson*, 2015 WL 5601876, at *16)].

Although the claimant is generally responsible for providing the evidence used by the Commissioner to make a finding about the claimant's RFC, before making a determination that the claimant is not disabled, the Commissioner is responsible for developing a complete medical history. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

46

Indeed, the ALJ has an affirmative duty to develop a full and fair record because administrative hearings are not adversary proceedings. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995); *Lucas v. Sullivan*, 918 F.2d 1567, 1573 (11th Cir.1990); *Smith v. Bowen*, 792 F.2d 1547, 1551 (11th Cir. 1986); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). *But see Allen v. Schweiker*, 642 F.2d 799, 802 (5th Cir. 1981) (where a disability claimant is represented before the agency, her representative has the power to present supporting evidence and challenge the testimony of the VE).[28]

Here, the ALJ accorded "some weight to the opinion of Dr. Carter that she keep the legs elevated as it is consistent with Claimant's subjective complaints and clinical signs and findings of lower extremity edema and venous insufficiency. Hence, a reasonable accommodation to elevate the feet 6 inches under the workstation when in a seated position was provided in the residual functional capacity."  [R44-45]. Dr. Carter indicated that Plaintiff needed to elevate her legs, but did not indicate how much elevation was required.  [R714].  Dr. Shelly's opinion, which the ALJ assigned great weight, is similar, merely stating that Plaintiff should elevate her legs whenever

---

[28]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

47

she is sitting down. [R1025]. On the other hand, the only support for Plaintiff's claims regarding her need to elevate her legs more than six inches is her own testimony that she or puts her right leg "up high" for the majority of the day. [R119, 134]. The difference between an elevation of six inches and higher elevation to above waist level has significant ramifications because, as the VE testified, the requirement to keep both legs elevated above waist level while performing sedentary work tasks would preclude all competitive employment. [R85].

Plaintiff's claims center on the fact that the ALJ arrived at the six-inch elevation limitation without any evidence supporting it and impermissibly substituted her own judgment for that of a physician. [Doc. 14 at 22]. However, Plaintiff simultaneously claims that the six inch elevation limitation provided by the ALJ was insufficient because medical sources (specifically, publicly available medical websites) recommend elevating one's legs above heart level to alleviate edema and fluid build up. [*Id.* at 24]. It is axiomatic that, if the ALJ cannot substitute her judgment for that of a physician by imposing a six-inch elevation requirement, Plaintiff also cannot, as she has done in her brief, rely on general medical website to impose a higher elevation requirement.

As a layperson, the ALJ is not qualified to interpret the medical records and findings. *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1374 (N.D. Ga. 2006) (citing

48

*Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992)); *Jackson*,

2015 WL 5601876 at *16. However, this is not a case where the ALJ interpreted raw

medical data; rather she more specifically (and narrowly) articulated the scope of the

general functional limitations offered by both Plaintiff and her treating physician. *See*

*contra Sneed v. Comm'r of Soc. Sec.*, No. 6:13-cv-1453-Orl-TBS, 2015 WL 1268257,

at *6, n.5 (M.D. Fla. Jun. 20 2018) (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.

Mar. 26, 1999) (wherein an ALJ impermissibly "reinterpreted highly technical MRI

imaging reports"); *Hendrickson v. Colvin*, No. 1:13-cv-2384, 2014 WL 6982640, at *9

(M.D. Pa. Dec. 10, 2014); *Ancona v. Astrue*, Civ. 09-cv-07164-WYD,

2010 WL 3874196, at *3 (D. Colo. Sept. 29, 2010); *Roso v. Commissioner*,

No. 5:09CV198, 2010 WL 1254831, at *8 (N.D. Ohio Mar. 11, 2010); *Casstevens v.*

*Astrue*, 1:07CV657, 2009 WL 1383313, at *4 (M.D.N.C. May 14, 2009), for the

proposition that an ALJ is "playing doctor" when he interprets raw medical data in an

MRI, test results, and xrays/imaging)). Nevertheless, "[w]hen medical findings merely

diagnose the claimant's impairments without relating those impairments to specific

residual functional capacities, the Commissioner may not make that connection

himself." *Rease*, 422 F. Supp. 2d. at 1374 n.54 (citation omitted); *see Hill v. Colvin*,

No. 7:13-CV-01238-JEO, 2014 WL 4681908, at *6 (N.D. Ala. Sept. 17, 2014) (where

49

the court reversed and remanded where the ALJ determined that plaintiff needed to elevate his leg to a footstool level: "If the ALJ did not find Plaintiff's testimony on this issue to be wholly or even partially credible, he could not simply assume that Plaintiff would get the same relief by elevating his leg to just footstool level. There needed to be evidence in the record to support such a finding, whether it came from the medical records, the testimony of a treating or consultative physician, or other credible source. Because there is no such evidence in the record, the case is due to be remanded for further development of the record, which may require further examination by the consultative physician and further testimony from the vocational expert."); *see also Tina T. v. Berryhill*, No. 17 C 50282, 2019 WL 354978, at *3 (N.D. Ill. Jan. 29, 2019) (reversing where "none of the medical evidence or testimony suggests that Plaintiff needed to elevate her legs only as high as a footstool"); *McKinnie v. Astrue*, No. 09 C 0614, 2010 WL 1257776, at *10 (N.D. Ill. Mar. 26, 2010) (criticizing the ALJ, in part, "impermissibly [making] her own concussions regarding the height [plaintiff] needs to elevate his legs").

It would be one thing if the ALJ did not assess elevation limitations at all or assessed the general elevation limitations present in the record. Instead, without any specific explanation or support, the ALJ imposed a six-inch height requirement for

Plaintiff's leg elevation. [R44]. As a result, the Court agrees with Plaintiff that it cannot discern an accurate or logical bridge from the evidence to her conclusion. *Flentroy-Tennant*, 2008 WL 876961 at *8. Plaintiff contends that remand is required so that the "ALJ may obtain information from a medical expert regarding the height to which Plaintiff must elevate her legs[.]" [Doc. 14 at 24-5]. The Court agrees that remand is warranted by this unexplained evidentiary gap between the record and the ALJ's RFC. *See Gallina v. Comm'r of Soc. Sec.*, 202 Fed. Appx. 387, 388-89 (11th Cir. Oct. 25, 2006) ("While an ALJ has discretion in determining whether to procure additional medical evidence, he still has an obligation to develop a full and fair record, and where review of the record reveals evidentiary gaps demonstrating unfairness, remand may be warranted."); *cf. Castle*, 557 Fed. Appx. at 854 (holding that "[w]here medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment") (punctuation omitted).

Accordingly, Plaintiff has shown reversible error on this specification, and the Court **REMANDS** the case to the Commissioner for further consideration of Plaintiff's claims consistent with this Order and Opinion.

51

AO 72A
(Rev.8/8
2)

**E.**    **The ALJ's step four and step five determinations are unsupported by substantial evidence because the ALJ relied upon an incomplete hypothetical question asked to the vocational expert.**

Plaintiff claims that, due to the aforementioned errors, the hypothetical questions posed to the VE did not reflect the full extent of Plaintiff's limitations, thus precluding substantial evidence support at steps four and five.  [Doc. 14 at 25].  The Commissioner responds that, because the RFC was not in error and the hypothetical presented to the VE accurately conveyed the RFC, there was no error.  [Doc. 16 at 21-22 (citing [R35-36, 42, 81-84]; [Doc. 14 at 24-25]; *McSwain v. Bowen*, 814 F.2d 617, 619-20 (11th Cir. 1987); *Graham v. Bowen*, 790 F.2d 1572, 1576 (11th Cir. 1986))].

The Court has found that remand is warranted due to the lack of record support for the RFC's leg elevation requirement.  Consequently, the RFC used as the basis for the hypotheticals posed to VE may be incomplete.

As a result, the Commissioner's decision is **REVERSED** and **REMANDED** to the Commissioner for further consideration of Plaintiff's claims consistent with this Order and Opinion.

52

AO 72A
(Rev.8/8
2)

*VIII. CONCLUSION*

In conclusion, the Commissioner's decision is **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART** for further consideration of Plaintiff's claims consistent with this Order and Opinion.

The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this the 29th day of March, 2019.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)